**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

WILLIE MACON,

Plaintiff,

vs. CASE NO.:

O - TOWN ENTERTAINMENT INC.
Florida Profit Corporation
d/b/a ELIXIR BAR ROOM AND HASH HOUSE

INJUNCTIVE RELIEF SOUGHT

Defendant(s).

**COMPLAINT**

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues O - TOWN ENTERTAINMENT INC., Florida Profit Corporation, d/b/a ELIXIR BAR ROOM AND HASH HOUSE ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as

amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.elixirorlando.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2. MACON files this lawsuit because Defendant's policies exclude him and millions of other potential consumers from fully and equally enjoying Defendant's products and services.

3. Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, Orlando Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court of the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Orange County, Florida.

6. Defendant attempts to and indeed does, participate in Orange County's economic life by offering and providing products and services over the internet to Orange County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7. Further, Defendant operates a Principal Place of Business with a physical address of 9 W Washington St, Orlando, FL 32801 (hereinafter "Defendant's Principal Place of Business"), which is located in Orange County, Florida.

8. MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal

access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

**PARTIES**

9. MACON is a natural person over the age of 18 and is blind.

10. MACON is *sui juris* and is a resident of the State of Florida, residing in Orlando, Florida, located in Orange County.

11. MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12. MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a

webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13. MACON's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14. MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15. Defendant is a Florida Profit Corporation with a principal place of business of 9 W Washington St, Orlando, FL 32801 (hereinafter "Defendant's Principal Place of Business").

16. Defendant operates a restaurant and bar under the name Elixir Orlando at Defendant's Principal Place of Business. Defendant provides food and beverage services to the public, including lunch, dinner, brunch and late-night service, and hosts events and promotional programming. Defendant operates Defendant's Website, through which consumers can obtain information regarding Defendant's menu offerings, hours of operation, events and other goods and services available at Defendant's physical location.

17. Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18. Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as a "place of public accommodation."

19. Defendant operates its restaurant and bar business from its Principal Place of Business, through which it provides food, beverage, dining, and

entertainment services to the public. Defendant's Website serves as a digital extension of Defendant's physical business and provides consumers, including consumers within this jurisdiction, access to information regarding the goods and services offered at Defendant's physical location. Through Defendant's Website, consumers can access Defendant's menu offerings, hours of operation, events, contact information, purchase food, book events/parties, and other services associated with its restaurant and bar. Defendant's Website is owned, controlled, and operated by Defendant in connection with Defendant's Principal Place of Business.

20. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in the Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## **FACTUAL AND SUBSTANTIVE ALLEGATIONS**

21. MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22. During MACON's Website Visits, MACON attempted to use Defendant's Website to view Defendant's menu and obtain information regarding the food, beverages, and dining services available at Defendant's Principal Place of Business, the same transactions and functions available to non-disabled customers through Defendant's Website. Defendant's failure to make these functions accessible to MACON's screen reader software denied MACON the same access to Defendant's goods that Defendant's Website provides to non-disabled customers.

23. Defendant's Website is additionally used to search for Defendant's brick-and-mortar location, check Defendant's hours, pricing, offerings, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24. The opportunity to shop and pre-shop Defendant's offerings available for purchase at Defendant's Principal Place of Business and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Principal Place of Business from his home are important

accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. These online functions directly affect MACON's in-store experience, such that they are tied to and provide a benefit to MACON. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software.

25. Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26. MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MACON attempted to utilize Defendant's Website:

a. March 02, 2026;

b. March 12, 2026;

c. March 29, 2026;

d. April 13, 2026;

e. April 28, 2026;

f. May 13, 2026;

g. May 20, 2026;

h. May 28, 2026;

i. May 29, 2026;

j. June 17, 2026;

k. July 02, 2026;

l. July 17, 2026; and

m. August 03, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28. While pre-suit notice to Defendant is not required, MACON sent a pre-suit communication on March 12, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29. Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30. However, Defendant’s Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

**VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT**

31. MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32. On July 26, 1990, Congress enacted the Americans With Disabilities Act (“ADA”), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33. Congress found, among other things, that:

a. some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b. historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c. discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d. individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

e. the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the

> opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

> a. provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;
>
> b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and
>
> c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any

person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

37. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

---

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[2] 42 U.S.C. § 12188(b).

[3] 42 U.S.C. § 12188(a).

[4] Johnson, *supra* note 8.

38. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40. Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

---

[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

42. There is a physical nexus between Defendant’s Website and Defendant’s Principal Place of Business in that Defendant’s Website provides the contact information, physical address, operating hours, and access to products found at Defendant’s Principal Place of Business. Defendant’s Website acts as the digital extension of Defendant’s Principal Place of Business. The opportunity to research and pre-plan visits to Defendant's establishment by browsing Defendant's Website to review menu offerings, business hours, purchase food/drinks, contact information, event programming, party scheduling and other goods and services available at Defendant's physical premises, as well as to engage with Defendant's social media platforms and promotional content from home, are important accommodations for Plaintiff because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of

American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other

individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49. Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied

full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software. Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

**a. Skip to Content" Link Is Not Working on Activation**

i. **Issue:** The "Skip to Content" link is present on the page; however, upon activation, focus is not moved to the main content area as intended. Keyboard-only and screen reader users depend on functional skip links to bypass repetitive navigation elements and reach the primary content efficiently. The failure of this link to operate as designed

creates a significant navigational barrier, preventing users from accessing the main content without traversing all preceding elements.




ii. **WCAG 2.1 AA Violations:** 2.4.1 - A, 2.1.1 - A - Bypass Blocks

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, a non-functional "Skip to Content" link means they must navigate through all repetitive navigation elements on every page load before reaching the main content. This places a disproportionate and unnecessary burden on these users, severely limiting their ability to access page content efficiently and independently. The "Skip to Content" link must move focus to the main content container upon activation, remain visible to keyboard users, and function correctly with

assistive technologies so that repetitive navigation can be bypassed without obstruction.

**b. Social Media Links Opening in New Window Not Programmatically Defined**

i. **Issue:** The social media links present on the page open in a new browser window or tab; however, this behavior is not communicated programmatically. Screen reader users receive no announcement that activating these links will result in a new window or tab opening. Consequently, users may unexpectedly lose their current navigation context or position, making it impossible for them to anticipate the change in browsing context and continue navigating the site effectively.




ii. **WCAG 2.1 AA Violations:** 3.2.2 - A, 2.4.4 - A - On Input

iii. **Impact:** For users who are blind and rely on screen readers, encountering links that silently open new windows or tabs without prior notice causes significant disorientation. The unexpected loss of navigational context can make it extremely difficult to return to the previous page or understand what has occurred, undermining their ability to browse the site independently. Links that open in a new window or tab must include a programmatic and visible indication of this behavior—such as appending "opens in a new window" to the link text—so that assistive technologies can announce this information and all users are fully informed before activating the link.

**c. Menu and Menu Items Not Programmatically Defined**

i. **Issue:** The navigation menu and its associated menu items are not defined programmatically using the appropriate ARIA roles, states, and properties. Furthermore, users are unable to navigate between menu items using arrow keys, as required by standard keyboard interaction patterns. This prevents screen reader and keyboard-only users from understanding the structure of the menu or moving between

items efficiently, creating a substantial barrier to interacting with the site's navigation as intended.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.1.1 - A - Menubar

iii. **Impact:** For users who are blind and depend on screen readers, an improperly defined menu means the structure, roles, and states of navigation items are not communicated by assistive technology. Without proper ARIA implementation and keyboard support, these users cannot determine which items are available, whether submenus exist, or how to operate the navigation—effectively excluding them from meaningful interaction with the site. The menu must be programmatically defined using appropriate ARIA roles, states, and properties, with support for standard keyboard interactions such as arrow key navigation, so that all users, including those relying on

assistive technology, can access and operate the navigation without obstruction.

**d. Main Content Area Not Defined**

i. **Issue:** The page does not designate a main content area using a `` landmark element or an equivalent ARIA landmark. As a result, screen reader users are unable to quickly navigate to the primary content of the page, making it impossible to bypass repetitive elements such as navigation menus and page headers. This omission creates a significant barrier for users who rely on assistive technology to access the page's primary information efficiently.




ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** For users who are blind and use screen readers, the absence of a defined main content landmark means they

must navigate sequentially through all page elements—including repeated headers and navigation—before reaching the primary content. This significantly increases the time and effort required to access key information and undermines their ability to use the site independently and efficiently. The primary content area must be marked with a `` element or an equivalent ARIA landmark using `role="main"`, enabling screen reader and keyboard users to jump directly to the main content without unnecessary obstruction.

**e. Heading "Fresh Food. Zero Fuss. Always Real." Incorrectly Defined as H3**

i. **Issue:** The heading "Fresh Food. Zero Fuss. Always Real." represents a prominent section heading on the page; however, it is incorrectly coded as an `` element rather than the appropriate ``. This incorrect assignment disrupts the logical heading hierarchy of the page. Screen reader users rely on a consistent and accurate heading structure to understand the organization of content and navigate efficiently between sections. The improper heading level

makes it impossible for users to correctly determine the hierarchy and relative importance of this section.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and navigate pages using screen readers, heading levels serve as the primary means of understanding content structure and moving efficiently between sections. An incorrectly assigned heading level misrepresents the organization of the page, causing confusion about the relationship between content sections and making it significantly harder to locate and interpret information accurately. The heading "Fresh Food. Zero Fuss. Always Real." must be defined using the correct `` level, as it represents a primary section beneath the main page heading, ensuring that the heading hierarchy

accurately reflects the content structure and supports efficient navigation for all users.

f. **Decorative Image Incorrectly Uses Descriptive Alternative Text**

i. **Issue:** A decorative image on the page has been assigned descriptive alternative text, despite serving no meaningful informational purpose. Because decorative images convey no functional content, the presence of descriptive alt text causes screen readers to announce irrelevant information to users, preventing them from focusing exclusively on substantive page content and creating an unnecessary accessibility barrier.




ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** For users who are blind or visually impaired and rely on screen readers, the announcement of descriptive alt text on a purely decorative image introduces audio clutter that interrupts the natural flow of content consumption. This forces users to process information that carries no functional value, making it significantly more difficult to identify and engage with meaningful content. Decorative images should be assigned an empty alt attribute (alt="") so that assistive technologies skip them entirely, ensuring that blind users hear only content that is relevant and purposeful during page navigation.

**g. Empty Heading Level 1 Defined on the Page**

i. **Issue:** The page contains an empty heading element that includes no text or meaningful content. Heading elements, particularly at level one, are critical structural landmarks that convey the primary topic or purpose of a page. An empty element fails to communicate any information, depriving users of the foundational context needed to understand page content and navigate efficiently.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and navigate web pages using screen readers, the heading serves as the primary entry point for understanding what a page is about. When this element is empty, blind users receive no meaningful announcement upon encountering it, leaving them without the contextual orientation necessary to determine the page's subject matter or structure. This absence of information creates a significant barrier to efficient navigation and comprehension. All elements must contain descriptive text that clearly identifies the main topic of the page, and any empty heading elements must be removed or replaced with substantive content to ensure equitable access for screen reader users.

**h. The "Lunch at Elixir Orlando" Heading Incorrectly Defined as H3**

i. **Issue:** The text "Lunch at Elixir Orlando," which functions as the primary title of the page, has been incorrectly marked up using an element rather than the semantically appropriate element. This misrepresentation of the page's heading hierarchy obscures the primary topic of the page and prevents assistive technologies from accurately conveying the page structure to users who depend on heading levels for navigation and orientation.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and rely on screen readers to navigate page structure, heading levels are essential tools

for understanding content hierarchy and locating primary information efficiently. When the main page title is assigned an incorrect heading level, blind users are unable to identify it as the primary topic of the page, resulting in confusion and an inaccurate understanding of the content structure. The main page title must be defined using an element, with subsequent section headings assigned to or lower levels in accordance with the logical content hierarchy, ensuring that all users can navigate the page accurately and without unnecessary barriers.

**i. Missing Heading Level 1 on the Page**

i. **Issue:** The page does not include a heading level 1 () element to identify its main topic or purpose. The heading is a fundamental structural component that establishes the primary subject of a page and supports efficient navigation. Its absence deprives users of a critical orientation landmark and undermines the clarity of the page's overall content hierarchy.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and navigate using screen readers, the heading is typically the first element consulted to determine the purpose and primary content of a page. When no is present, blind users are denied this essential point of reference, making it impossible to quickly ascertain the page's subject matter or understand how the content is organized. This constitutes a significant accessibility barrier that impedes efficient and independent navigation. The page must include a single, descriptive heading that clearly communicates its main topic or purpose, with all subordinate headings following a logical and programmatically accurate hierarchy beneath it.

**j. Multiple Header Sections with Nested Header Elements**

i. **Issue:** The page contains multiple elements, including a nested tag defined within the main header section to contain navigation menu links. This structural approach produces an ambiguous and programmatically inaccurate page layout, as the element is not designed to be nested within another . The resulting markup fails to clearly delineate the relationship between the primary page header and the navigation section, undermining the integrity of the page's semantic structure.




ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** For users who are blind and depend on screen readers and assistive technologies to interpret page structure, the presence of nested elements creates significant confusion regarding the organization and hierarchy of page regions. When the structural relationship between the main

header and navigation content cannot be reliably determined, blind users are unable to efficiently orient themselves within the page or navigate between sections with confidence. This represents a meaningful barrier to independent and effective use of the page. The main page header should consist of a single element containing site branding and primary navigation, with navigation menus appropriately marked up using a element or other semantically accurate alternatives, ensuring a clear and accessible page structure for all users.

**k. Food Menu Defined Using Image of Text**

i. **Issue:** The food menu is rendered as an image of text rather than as actual, programmatically accessible text content. Users who rely on screen readers, text resizing, high-contrast modes, or other assistive technologies are unable to access, read, navigate, or interact with the menu content. Menu content should be provided as real, selectable text rather than as images, as images should only be used for decorative purposes and all meaningful textual

information must be accessible programmatically to support screen readers, resizing, and other assistive technologies.




ii. **WCAG 2.1 AA Violations:** 1.4.5 - AA, 1.1.1 - A - Non Text Content

iii. **Impact:** For users who are blind and rely on screen readers, the food menu is entirely inaccessible, as screen readers cannot interpret or convey the textual content embedded within an image. This creates a complete and significant barrier to understanding the restaurant's offerings, leaving blind users wholly unable to independently read, navigate, or engage with the menu. Users who depend on text resizing or high-contrast display settings are equally affected, as image-based text does not respond to these accommodations, further compounding the exclusion experienced by individuals with visual disabilities.

51. Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about March 3, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including MACON.

52. More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

53. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Defendant 's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

54. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraph 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57. Here, however, MACON, through counsel, did send a pre-suit communication informing of the barriers to access on March 12, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58. As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to its Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

59. Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60. Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61. MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief, including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's

Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's

Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

Dated: September 11, 2026 Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com
**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**